2021 IL App (1st) 191919-U

No. 1-19-1919

Order filed November 19, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 91 CR 21451 |
| | ) | |
| VICTOR CHATMON, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SHARON ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Daniel Pierce and Justice Mary Mikva concurred in the judgment

**ORDER**

¶ 1     *Held*:  We affirm where: (1) the State provided reliable eyewitness identification, and (2) defendant's trial counsel was not ineffective for failing to predict future case law. We vacate defendant's conviction on count six for first degree murder as violative of the one-act, one-crime doctrine and order the mittimus to be corrected.

¶ 2     Defendant Victor Chatmon was charged with six counts of first degree murder of Joseph Burdine (decedent). Following a bench trial, he was convicted on two counts and sentenced to two concurrent terms of 45 years in the Illinois Department of Corrections.

¶ 3    On appeal, defendant contends that: (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt because the State presented unreliable witness identifications; (2) he received ineffective assistance when trial counsel failed to file a motion to suppress his arrest; and (3) his mittimus violated the one-act, one-crime rule. For the following reasons, we affirm the trial court.

¶ 4                                    BACKGROUND

¶ 5    At trial, Ashlee Mason testified that on March 19, 2015, she was on the phone with decedent beginning around 10 a.m. Mason stated that as they talked on the phone, decedent walked from his grandmother's house, around 80th and Troy, to the store before he went to work. Mason recalled that after he had gone to the store, she heard someone call out decedent's nickname, "Mookie-Mook." but she didn't recognize the voice. Mason then tuned decedent out a little because she thought he was going to start talking with a friend. Mason recalled her mother coming into the room around that time, and when Mason turned her attention back to decedent, he would not respond to her. Mason remained on the line and started hearing a radio dispatch that she assumed belonged to the police. Mason testified that she never heard gunshots but stayed on the line to figure out what was going on. Mason stated that she figured out what happened by reaching out to people and then she went to the crime scene.

¶ 6    On cross examination, Mason testified that while she was on the phone with decedent, she never heard him arguing with anyone nor did she hear a physical fight ensue. She also did not know if decedent had any disputes with anyone at the time.

¶ 7    Walter Williams testified that on March 19, 2015, at approximately 11:10 a.m. he was working for the city of Chicago booting vehicles at 80th and Kedzie. Williams testified that he was parked on Kedzie facing south and to the right of him was a daycare, next to the daycare was

a parking lot, and next to the parking lot was a liquor store. Williams pulled his vehicle over so that a fire truck could back into a fire station, which was south of the liquor store, while he reviewed his work on his laptop. Williams recalled someone coming out of the liquor store through mostly his peripheral vision, because although he looked up for a second, his focus was on his laptop. Williams stated that the person then crossed past his location on Kedzie and went towards 80th. Williams could not recall the person's gender or hairstyle. Williams recalled that the person was wearing a dark shirt and blue jeans. William testified that after the person crossed his path, he heard gunshots ring out. At that point, because of his trade, Williams ducked down into his vehicle out of fear that his car was being shot at. Williams testified that he saw someone run into the alley, east of Kedzie going northbound, but he did not know if it were the same person as before. Williams stated he could not see the south side of 80th Street and could not see if there was another person in the alley. After the gunfire ceased, Williams sat up and saw a firefighter and another man who walked towards the shooting area: everyone was asking if each other heard the gunshots, to which Williams recalled stating yes.

¶ 8      Williams decided to relocate by backing up onto 80th Street from Kedzie and then went eastbound on 80th, as he was doing so, he was flagged down by a man on a bike who asked him to call 911. Williams testified that he did not call 911, instead, he called the boot unit dispatch and they proceeded to call 911. Williams stated that he waited at the scene for the ambulance and police to arrive, however, he did not go all the way down the alley. Williams exited his vehicle and took around 10 to 15 steps, he just went far enough to see that there was someone lying on the ground. On direct, Williams could not recall if it was the same person who crossed his peripheral but stated that it was the same person he saw running into the alley. However, on cross examination, Williams

testified that he could not state for sure if the person he saw run into the alley was the same person lying on the ground in the alley.

¶ 9    Alonzo Singleton testified that on March 19, 2015, he was visiting his daughter at her home located at 3154 West 80th Street. Singleton recalled that he was on the second-floor of the building, in the front of his daughter's apartment which had a picture window facing 80th Street and in the back, there were windows facing the alley in between Kedzie and Troy. At approximately 11:10 a.m., Singleton along with his wife and daughter were sitting on the couch watching television, facing the picture window, when he heard three or four gunshots. Singleton testified that he was inclined to go look to see what happened but out of caution, waited a few seconds or possibly a minute before he went to the window to look. Singleton stated that he went to the window, and he saw a young man walking in an alley going south of 80th and east of Kedzie with something in his hand, but he did not know what it was. Singleton clarified that the alley he was describing was not the alley that was visible from the back of his daughter's apartment, but rather it was across the street. Singleton recalled only seeing the man's backside but described as being black, tall, skinny, and wearing dark clothing. Singleton testified that he never saw this person's face. Singleton recalled that the day was sunny, and nothing was obstructing his view and while there was a tree located near his daughter's apartment building, it did not have leaves on it. Singleton stated that while he was observing the young man walking down the alley, his daughter called him into the back of the apartment where they could see from the rear window that a body was lying in the alley.

¶ 10    On cross examination, Singleton reiterated that the tree near his daughter's apartment did not cause him to have problems seeing the street. Singleton clarified that he did not see the shooting occur. Singleton could not recall if the young man walking away from the alley had on a hat,

hooded sweatshirt, sweatpants, blue jeans, running shoes, or tennis shoes. Singleton was able to recall, however, that the person had dreadlocks as a hairstyle and that his hands were down by his side with an unidentified object in his right hand.

¶ 11    Alscee Bonner testified that on March 19, 2015, he was around the alley at 79th between Troy and Kedzie. Bonner recalled that he was outside with others early but could not remember the exact time when he heard gunshots. Bonner testified that he did not know where the gunshots came from and could not see what was happening in the alley because buildings were obstructing his view. Bonner recalled taking a look down the alley to make sure he would not be in the line of fire, and he saw a person running north down the alley then made a right towards Kedzie. Bonner testified that he saw a short man on Kedzie approaching a vehicle, but he did not know if he had anything to do with the incident. Bonner stated that he rode his bike in the alley on 80th between Troy and Kedzie, at which point, he saw the man who was running lying down in the alley. Bonner testified that he did not see who he was running from. Bonner recalled not recognizing who decedent was at first, however, he came to realize it was a family friend named Mookie. Bonner stated that he then called 911 and flagged someone down to also call 911. Bonner proceeded to go to decedent's family house, and ultimately, they followed him to the crime scene.

¶ 12    On cross examination, Bonner testified that he also knew defendant from the neighborhood. Bonner admitted that he had been smoking marijuana on the morning of the shooting but insisted it did not impair him. Bonner testified that he did not see anyone running southbound and did not see defendant running in the alley. Bonner clarified that to run northbound meant that decedent was running toward Bonner, and then decedent turned right, at which point Bonner no longer saw him.

¶ 13    Jacquetta Tate testified that on March 19, 2015, she lived with Paul Stingley, at 3148 West 80th Street. Tate recalled that her apartment at that location had windows in the front and back of her second-floor apartment. Tate testified that at approximately 11:10 a.m. she was in the front of her apartment sitting on her couch when she heard three to four gunshots ring out. Tate recalled that she had her daughter in her lap and waited a moment before approaching the window in front of her to look outside. Tate described seeing a man across from her building lowering his right hand, which contained a gun. Tate testified that nothing was obstructing the man's face and he was wearing a black hoodie, light blue jeans, and a black pair of shoes. Tate stated that the man took about two steps towards Kedzie and then turned around and speed-walked through the alley that was across the street from her building towards 81st Street. Tate identified defendant in court as the man she saw with a gun in his hand after hearing gunshots. Tate testified that defendant went down the alley for two or three house lengths and then went down someone's gangway on the right side of the alley. After hearing sirens, Tate recalled going to her son's room where she was able to see a body lying in the alley. Tate recalled telling the police what she observed on that date. A month later, on April 19, 2015, she was contacted by Detective Lopez who arrived at her new home in Dolton, Illinois to show her a photo array. The next day, Tate identified defendant out of a live lineup at Area Central as the person she saw on March 19, 2015, immediately after hearing gunshots. Tate recalled that she viewed the lineup without Stingley. Tate testified that the lineup participants were all seated and that she identified defendant as the person who shot decedent on 80th and Kedzie. At trial, Tate was shown a photo still from March 19, 2015, and she testified that the person in the photo was defendant who  wore the clothes that she previously testified to and ran through a parking lot that was near a daycare and a liquor store.

¶ 14    On cross examination, Tate testified that she initially told Detective Cerven what she observed and that after hearing the gunshots she saw the man across from her building with a gun in his hand. Tate did not believe she was asked that question at the grand jury. Tate testified that the day after the shooting, she was interviewed again, and did not recall stating that she saw a person with a gun in their hand. Tate acknowledged that she did not know if the man that she identified as defendant shot the decedent. Tate testified that when the shots rang out, she was not very concerned for her daughter's safety because she was on the top floor. Tate testified that although there was a tree in front of her building, and near her windows, she still had a good view of the incident because there were no leaves on the tree at the time. Tate stated she did not know who defendant was. When asked to estimate the distance from where she saw the man standing to her apartment, Tate admitted she did not know. Tate described that from the time she heard the gunshots to when she saw the man fleeing took a matter of seconds. Tate could not recall if the man had facial hair but remembered that he was tall, dark, and skinny. Tate testified that Stingley was next to her on the couch, but since he was facing her, he saw out the window first. Tate recalled that they were wondering who was being shot at because they did not see anything: they just heard the gunshots in the beginning. Tate testified that although the man she spotted fleeing the scene had a hoodie on, it was not over his head. Tate recalled being able to tell that defendant was the tallest in the live lineup even though all of the participants were sitting.

¶ 15    On redirect examination, Tate testified that she identified defendant based on his facial features and she recognized him to be the person from the day of the shooting on 80th and Kedzie. Tate clarified that she saw a black gun in defendant's hand on the day of the shooting. On recross examination, Tate testified that the gun looked like a typical handgun, and it did not resemble a mobile phone. Tate could not recall what was done with the gun after defendant started to flee. On

further redirect examination Tate testified that she was deliberately paying attention to details because, in that area, she grew accustomed to law enforcement asking questions when there was a death.

¶ 16    Chicago police detective Jorge Lopez testified that he worked at Area Central and was assigned to conduct a photo array for the shooting that occurred on March 19, 2015. On April 19, 2015, he went to Dolton, Illinois, and spoke with Tate and Stingley separately. Detective Lopez stated that after Tate viewed the photo array, she identified defendant as the person who was outside immediately after three to four gunshots were fired and then began to run. After speaking with Tate, Detective Lopez recalled speaking with Stingley who identified defendant as the person he saw shooting three to five times.

¶ 17    On cross examination, Detective Lopez clarified that he had no other involvement in the case other than administering the photo array. Detective Lopez testified that Tate at no point mentioned that defendant was holding a firearm. Detective Lopez stated that Tate did not mention witnessing defendant lowering his arm as if he were shooting a firearm.

¶ 18    Chicago police officer Walenty Byk from the Fugitive Apprehension Unit testified that on April 20, 2015, he received an assignment to locate and bring in defendant. Officer Byk was given the address of 87th and Beverly where he saw defendant enter a vehicle and drive off. Officer Byk testified that defendant's vehicle was cut off by another responding vehicle and defendant was taken into custody and turned over to Detective Stanek.

¶ 19    Chicago police sergeant Robert Garza testified that on April 20th, 2015, he was a detective at Area Central and was asked to administer a lineup. Sergeant Garza instructed Tate that the lineup participants would sit on the bench and if she needed them to get closer, he would have them instructed to do so. Sergeant Garza testified that she did not request anyone to come closer and

picked defendant from the lineup. Sergeant Garza stated that after Tate was completed with her lineup, he conducted a lineup with Stingley with the same lineup and gave him the same instructions. Before making an identification Sergeant Garza recalled that Stingley asked for the participants to step forward, which they did; afterward, Stingley identified defendant.

¶ 20    Paul Stingley testified that on March 19, 2015, he was living at 3148 West 80th Street at the time with Tate and their two children. At approximately 11 a.m. on that day, Stingley recalled watching television when they started talking about how people in the neighborhood were getting their vehicles booted so they were also looking out of the window. Stingley remembered that day to be sunny and that there were no leaves on the tree near his building. Stingley stated that as he was looking outside, he saw a man walking down 80th Street, from Kedzie towards Troy. Stingley recalled that the man was wearing a black hoodie, blue jeans, and dark shoes. Stingley testified that as the man got to the alley between Kedzie and Troy, he saw him open fire in the direction towards his apartment. Stingley estimated that the man shot about three to five gunshots. Stingley testified that there was nothing that was obstructing his view of the shooter. Stingley stated that he did not know who the shooter was and could not see who he was shooting at. Stingley recalled that the shooter used a dark handgun. Stingley testified that when the shooter finished firing his gun, he ran into the alley opposite his apartment for the length of a few houses, cut between a yard, and merged back towards Kedzie running in the parking lot between the liquor store and daycare before he lost sight of him. Stingley recalled that after the shooting, he and Tate looked out of their children's bedroom window and saw a body on the ground. Stingley proceeded to go downstairs and talked to the police who arrived, and he told them what he saw.

¶ 21    Stingley testified that on April 19, 2015, Detective Lopez came to their new residence in Dolton, Illinois, and showed him a photo array. Stingley identified defendant in court, as the

individual he selected in the photo array to be the shooter. Stingley stated that on April 20, 2015, he arrived at the police station at 51st and Wentworth and met with Detective Garza. Stingley was shown a live lineup where he identified the shooter and identified defendant as the individual selected. Before selecting defendant, Stingley recalled asking Detective Garza to make the shooter step up.

¶ 22    On cross examination, Stingley clarified that he was already looking at the window when he first heard the gunshots, however, he had to ascertain where exactly the gunfire was coming from. Stingley denied telling the police that the shooter was wearing a royal blue hoodie. Stingley recalled the shooter having some facial hair and a low haircut and did not recall it being styled in dreadlocks. Stingley described the amount of time that he saw the shooter as being less than two minutes, but it could have been one minute. Stingley stated that after hearing the gunshots he was concerned for his family's safety but not about the gunshots reaching them at the time. Stingley clarified that his apartment is on the third level but technically it is on the second-floor. Stingley testified that he only asked for defendant to step forward and he was the only participant in the lineup who stepped forward.

¶ 23    Chicago police detective Daniel Stanek testified that on April 20, 2015, he was assigned to investigate the murder of decedent and spoke to defendant after advising him of his *Miranda* rights. Detective Stanek stated that defendant waived his *Miranda* and agreed to speak to him. These recorded conversations were played for the trial court.

¶ 24    On cross examination, Detective Stanek clarified that in part of the video, he was trying to get defendant to admit it was him running through the parking lot. Detective Stanek acknowledged that he told defendant that he should be truthful about whether he was the person running through the parking lot and that it would determine how everything would go. Detective Stanek recalled

that defendant admitted to being in the lot and he subsequently retracted that statement shortly after. The State rested its case.

¶ 25    Detective Lopez was called to testify again during defendant's case-in-chief. He testified that at the live lineup Tate gave a statement but did not include her observing the shooter with a firearm.

¶ 26    Timothy Cerven, a former Chicago police detective, testified that on March 19, 2015, he arrived near the area of 80th and Kedzie. Cerven spoke with Tate, but she did not inform him that she saw a shooting, saw a person with a handgun, or observed a person lowering his arm to his side. Cerven recalled that Tate told him she heard three to four gunshots. Cerven testified that Tate told him that there was a male who crossed the street and looked panicked, and he then ran southbound down the alley. Tate informed Cerven that this person had on a black hoodie, blue jeans, and black shoes. Cerven clarified that when investigating, he would not have specifically asked Tate whether she saw a firearm, instead, he would have just let the witness tell their story. On cross examination, Cerven testified that Tate also indicated that the man she identified was tall and slender, and she informed him that she saw the man's face.

¶ 27    Chicago police detective Scott Reiff testified that on March 19, 2015, he was investigating the homicide of decedent near 80th and Kedzie. Detective Reiff stated that he spoke with Stingley who indicated that he made certain observations from his window. Detective Reiff recalled that initially Stingley told him the shooter was wearing a royal blue hoodie, but during the same conversation, he changed the description to "possibly a black sweatshirt" and a blue shirt underneath. Detective Reiff understood that Stingley might have been already looking out the window of his apartment when he heard two shots and proceeded to ascertain exactly where it came from.

¶ 28    At the close of evidence, defendant filed a motion for a directed finding, which was denied by the trial court.

¶ 29    The trial court found defendant guilty on all counts. The trial court based its decision on the fact that there were two eyewitnesses to the murder and matched the IPI criminal instructions to them.  The trial court found the circumstantial evidence to be strong, specifically, the videotape of defendant running through the nearby parking lot and his admission to being there. The trial court did not find that the two eyewitnesses were under any undue stress, nor did it find that their view of defendant was obstructed by leaves on a tree or the lighting since it was daylight. The trial court specifically noted that both eyewitnesses positively identified defendant in the live lineup, without any taint and they were highly credible and reliable.

¶ 30    On May 3, 2018, defendant filed a motion for a new trial alleging: (1) he received ineffective assistance when counsel failed to investigate, call an identification expert, and notify defendant that counsel was suspended from the practice of law during the pendency of the case; (2) the verdict was against the manifest weight of the evidence; and (3) the trial court improperly denied his motion for a directed verdict.

¶ 31    On February 28, 2019, an amended motion for a new trial was filed alleging (1) ineffective assistance of counsel, and (2) that the evidence was insufficient as a matter of law to sustain a conviction. Defendant's allegation of ineffective assistance was substantially similar to the original motion. Defendant maintained that no physical evidence tied him to the crime, only two eyewitnesses which was the entire case against him. Defendant alleged that several factors existed that could lead to false eyewitness testimony which were: (1) Tate and Stingley had a short time to view defendant, who they did not know, and it was a stressful event for them both; (2) both Tate and Singleton initially gave vague and general descriptions in their initial reports as to the physical

descriptions of the shooter and the exact timing of when Stingley looked out the window appeared to differentiate; and (3) In the initial reports, Tate had not reported seeing a weapon.

¶ 32 On May 8, 2019, the State filed a response to the motion for a new trial arguing that defendant was convicted after the State presented several pieces of evidence that each corroborated each other. The State asserted that any conflict was for the trier of fact to weigh. The State argued that trial counsel was not ineffective because he was not required to consult with defendant about his trial strategy and he had no obligation to inform defendant of his disciplinary background.

¶ 33 At the hearing on the motion for a new trial, defendant argued that the evidence demonstrated that the eyewitnesses were unreliable when Stingley initially stated that he was at the window when he saw the shooter, then at trial, Stingley testified to approaching the window after hearing the gunshots. Defendant emphasized that the identification of defendant was delayed by a month, further compromising the reliability of their identification. Defendant argued that the testimony regarding facial hair and the shooter's hairstyle differed among Stingley, Singleton, and Tate. Defendant also asserted that the testimony of the eyewitnesses contradicted the testimony of Bonner. Bonner indicated there was a short man in the direction where the shots were being fired who got into a vehicle and left; although Bonner knew defendant, he did not know that man. Defendant argued that the testimony of the eyewitnesses is further contradicted by the testimony of Williams, who described seeing a person enter the alley only after shots were fired. Defendant maintained that there were enough contradictions presented at trial to establish a lack of reasonable doubt based on the sufficiency of the evidence. Defendant sought for the trial court to allow the case to be retried with an identification expert, which he believed should have been provided at trial; failure to do so was ineffective. Further, defendant argued that trial counsel should have

moved the court to suppress his identification because it was clear that he was the tallest in the lineup and the eyewitnesses had already described the shooter as tall.

¶ 34    The State argued that the two eyewitnesses had a clear unobstructed view of the shooter and if there were any inconsistencies, they were minor. The State maintained that Tate and Stingley each independently identified defendant as the shooter multiple times. The State asserted that their testimony was not the only evidence presented: there was videotape of defendant running through the parking lot and defendant admitted that he was in the area at the time.

¶ 35    The State also argued that the man Bonner saw get into the vehicle, had nothing to do with the shooting and does not contradict the eyewitnesses because Bonner said that he saw the victim running northbound in the alley and the shooter was shooting into that alley.  Similarly, the State asserted that Williams' testimony did not contradict the eyewitnesses because he was located south of 80th Street near the side of the alley, where he would not have been able to see the shooter. Lastly, the State argued that trial counsel apparently based its decision on trial strategy when it did not move to have defendant's identification suppressed.

¶ 36    In denying defendant's motion for a new trial, the trial court found trial counsel's performance to be thorough, "fantastic" and effective. The trial court opined that *Lerma*, which was relied on by defendant, does not stand for the proposition that an identification expert must be presented if identification is at issue. The trial court noted that the case was not solely based on eyewitness testimony but also included defendant's admission that he was in the area and the videotape of him in the parking lot. Further, the trial court did not find that Bonner's testimony was contradictory because it appeared that he and the eyewitnesses had different vantage points.

¶ 37    Defendant's subsequent motion to reconsider the denial of a new trial, was denied for similar reasons as both defendant and the State basically reiterated the same arguments.

¶ 38    At the sentencing hearing, the State argued in aggravation that defendant had a criminal history dating back to 2011 and the facts of this case were so egregious since decedent was gunned down unprovoked. Decedent's brother and mother each made victim impact statement's informing the trial court of their loss. The State maintained that this warranted a sentence on the higher end of 45 years to life, while defendant argued that the trial court should sentence him to a minimum of 45 years. In mitigation, defendant argued he has never been violent with anyone, and his mother testified to her son's character. Defendant apologized to defendant's family and asked for mercy from the trial court. The trial court ultimately merged counts one through four into counts five intentional murder (720 ILCS 5/9-1(a)(1) (West 2014)) and six, knowing murder (720 ILCS 5/9-1(a)(2) (West 2014)). and sentenced defendant on both counts five and six to 45 years each in the Illinois Department of Corrections, to be served concurrently. On August 13, 2019, defendant filed a timely notice of appeal.

¶ 39                                              ANALYSIS

¶ 40    On appeal, defendant contends: (1) he was not found guilty beyond a reasonable doubt because the State presented unreliable witness identifications; (2) he received ineffective assistance when trial counsel failed to file a motion to suppress his arrest; and (3) his mittimus violates the one-act, one-crime rule.

¶ 41                                    A. Witness Identification

¶ 42    Defendant contends that Tate and Stingley were inherently unreliable pursuant to the five *Biggers* factors citing *Neil v. Biggers*, 409 U. S. 188, 199-200 (1972) as support. Defendant asserts that the first factor, the opportunity to see the offender, is the most important of the factors. Defendant maintains that Tate and Stingley only witnessed the shooter for a matter of seconds, from their second-floor apartment which was at least 70 feet away with mature trees blocking their

line of sight. The State contends that the five factors weigh in favor of credible identification testimony. The State asserts that the opportunity that Tate and Stingley had to observe the shooter cannot be said to be insufficient to provide an opportunity to identify defendant. The State maintains that they had a good view of the shooter from their apartment on that sunny day, the tree near their window had no leaves, nothing was blocking their view, and nothing was obstructing defendant's face because his hoodie was down. The State contends that although Tate testified to only seeing defendant for a couple of seconds, Stingley saw him for about a minute. The State rejects defendant's claim that they were 70 feet away from the shooter when that was not testified to.

¶ 43     For the second factor, the witness' degree of attention, defendant contends that this factor also indicates an unreliable identification because they were watching television with their infant daughter. Defendant asserts that at this point, their attention was diverted because the presence of the firearm caused concern for their safety. The State asserts that the attention of Tate and Stingley was squarely focused on the shooter and not compromised by any stress. The State maintains that Tate addressed this in her testimony when she said she was not concerned for her safety since the shooting occurred on the ground floor and she lived on the top floor. The State further maintains that this sentiment was echoed by Stingley when he testified to not being concerned with gunshots entering their apartment from the ground floor.

¶ 44     Defendant claims that the third factor, the witness' prior description, also weighs in favor of an unreliable identification because both Tate and Stingley had varying descriptions at different points of the investigation. Defendant points out that Tate did not mention that she witnessed a firearm during the initial investigation or the grand jury. Stingley on several occasions stated he approached the window after he heard gunshots and saw a man who fired off several more rounds,

while on other occasions Stingley testified that he was at the window when he saw defendant approach the alley, pull the gun out, and shoot. Defendant asserts that they both had contradicting statements about the shooter's facial hair; Stingley testified that the shooter had facial hair while Tate described him as clean-shaven. Further, Stingley testified that the shooter had a "low haircut" while Singleton testified to the shooter having dreadlocks. The State contends that the descriptions that Tate and Stingley made do not weigh towards finding them uncredible because they both ultimately identified the shooter as wearing a black hoodie. This is despite Stingley initially stating that the hoodie was royal blue: when asked to elaborate he stated it was possibly a black hoodie instead. Further, the State asserts that Tate's initial omission of the shooter holding a firearm does not render the identification unreliable because Cerven explained that he never asked her about a firearm.

¶ 45    Defendant contends that the fourth factor, the witness' level of certainty should carry very little weight because Stingley demonstrated that he was uncertain when he only asked defendant to step up before he made a positive identification. The State contends that Tate and Stingley were unwavering in their identifications as to defendant and positively identified him each time they were called upon to do so in a: photo array, live lineup, and trial. The State rejects defendant's contention that this factor should be given little weight because this court has not traditionally given little weight to this factor.

¶ 46    For the fifth factor, the length of time between the crime and confrontation, defendant asserts that this weighs against reliability when the crime happened a month and a half before the photo array was conducted; this passage of time created the risk of misidentification. The State contends that the length of time between the crime and the identification does not weigh against

reliability because this court has previously held that identifications can be reliable for nearly three months or more citing *People v. Green*, 2017 IL App (1st) 152513, ¶113 as support.

¶ 47   Defendant contends that the State's case produced no physical evidence implicating him and relied heavily on the testimony of Tate and Stingley; neither of whom saw defendant shoot the decedent. Defendant maintains that even though Stingley testified to seeing him shoot a weapon, he did not see the intended target. Defendant contends that the other eyewitness testimony did not corroborate each other. Defendant asserts that Stingley testified that he saw the offender shooting only towards the alley between Kedzie and Troy. Bonner testified that he was in a parking lot located in the alley between Kedzie and Troy when he heard several gunshots, and then saw a man, presumably decedent, run into the alley. Williams testified he was parked on Kedzie just south of 80th when he heard gunshots and then saw a person run north into the alley. Defendant contends that if the man Stingley saw was shooting only in the direction of the alley, and decedent ran into the alley after the gunshots stopped as Bonner and Williams testified, then the gunshots from the gun held by the man that Stingley observed could not have been the gunshots that hit decedent. Based thereon, defendant maintains that the evidence was insufficient to find him guilty beyond a reasonable doubt.

¶ 48   The State rejects defendant's contention that the other evidence presented at trial did not contradict the testimony of Tate and Stingley and did not undermine defendant's guilt. The State contends that the testimony of Bonner and Williams did not make it impossible for the shooter that Stingley saw to have hit and killed the victim. The State maintains that Stingley testified to hearing shots, which was why he initially looked out the window, therefore, it was possible that Williams and Bonner saw the victim after hearing gunshots. The State maintains that any discrepancies in

testimony were properly resolved by the trial court as trier of facts citing *People v. Vaughn*, 2011 IL App (1st) 092834, ¶24 as support.

¶ 49    When reviewing a claim of insufficient evidence, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 17. It is the responsibility of the trier of fact to weigh and draw reasonable inferences from the testimony and other evidence, and it is better positioned than this court to do so because it can observe the witnesses and evidence. *Id*. We do not retry a defendant; we will not substitute our judgment for that of the trier of fact on witness credibility or the weight of evidence. *Id*. "Contradictory evidence or minor or collateral discrepancies in testimony do not automatically render a witness's testimony uncredible, and it is the task of the trier of fact to determine if and when a witness testified truthfully." *Id*. We will reverse a conviction only where the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id*. "When a finding of guilt depends on eyewitness testimony, we must decide whether the trier of fact could reasonably accept the testimony as true beyond a reasonable doubt." *Id*.

¶ 50    Here, Defendant was convicted of first degree murder after the State presented evidence of witness testimony. All of the witnesses testified to hearing a set of gunshots in the neighborhood. Each witness observed what would ultimately be identified as decedent's body lying in the alley after the gunshots. Tate recalled seeing defendant lowering his arm and fleeing from the alley where decedent was lying. Stingley testified to seeing defendant firing his gun into the alley. The State presented evidence of a videotaped recording of defendant, where he acknowledged he was the individual seen in a parking lot near the shooting around the time it occurred. Defendant

challenges the reliability of the witnesses, a lack of an admission made by him, and the lack of physical evidence presented at the trial.

¶ 51    First, we will address defendant's contentions that he made no admission and was not convicted with any physical evidence. This court has held that the testimony of a single witness is sufficient to sustain a conviction. *People v. Johnson*, 114 Ill. 2d 170, 189 (1986). Here, although there was no physical evidence tying defendant to the crime and he did not admit to the crime, there were multiple witnesses presented, when the State only needed a single one for a conviction. *Id.*

¶ 52    Now we will address defendant's contentions that Tate and Stingley were unreliable witnesses pursuant to the *Biggers* factors. As aptly argued by the parties, the United States Supreme Court has held that five factors assess the reliability of identification testimony. *Biggers*, 409 U. S. at 199-200. Those factors are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the offender, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id.*

¶ 53    For the first factor, both Tate and Stingley testified to observing a clear and unobstructed view of the offender on that sunny day; this factor favors the State. See *People v. White*, 2017 IL App (1st) 142358, ¶ 16 (witness had a clear and unobstructed view of the offender in broad daylight). Tate saw defendant for a matter of seconds, however, this was enough time for her to observe an unobstructed view in daylight of his physical appearance, him lowering his arm that held his gun, and then saw him run away from the scene. Stingley saw defendant for up to two minutes to a minute. Within that time, Stingley was able to observe an unobstructed view in

daylight of defendant's physical appearance as he shot his gun and then fled. We find this was a strong opportunity to view the offender. *Id.*

¶ 54    For the second factor, according to Stingley's testimony, it appears both Tate and Stingley had their attention drawn to the streets that day because they were discussing the cars that were being booted at that time in addition to watching television. Further, both testified to not feeling that their family was in immediate danger despite the presence of their small child during the shooting, as Stingley noted in his testimony, their apartment was high enough for them to not feel in imminent danger. Both witnesses provided detailed accounts of the shooting including details of what the shooter looked like and where he ran off to afterward; this factor favors the State. See *People v. Blankenship*, 2019 IL App (1st) 171494, ¶ 29 (degree of attention not compromised by the presence of gun when detailed and descriptive testimony indicated that the witness was attentive during the encounter).

¶ 55    For the third factor, Tate did not mention the firearm previously but testified that she was not asked about it, and Cerven corroborated that in his testimony. See *People v. Slim*, 127 Ill. 2d 302, 309, (1989) (a witness can give only a general description based on the total impression that the offender's appearance made and be sufficient). Both Tate and Stingley's descriptions of the offender were very detailed and remained consistent. Both testified to seeing the shooter carrying a gun and wearing a dark hoodie. Although there appears to be a discrepancy as to whether Stingley initially stated it was royal blue and then indicated it was black when asked to clarify, even if he did initially state that the general impression is sufficient; this factor favors the State. *Id.* Further, Tate recalled more specifics, namely, that the offender was dark, tall, and skinny. Lastly, defendant mischaracterizes Stingley's testimony on direct and cross examination. On direct examination, Stingley testified that he was already at the window when the shooting happened. While on cross

examination, Stingley clarified that he was sitting at the window and looking out of it but when the shots rang out, he assessed where they were coming from and focused on that. This clarification is not a discrepancy and defendant has not supported this argument with any legal citation to how it is relevant to the third factor, the accuracy of the prior description of the offender. See *People v. Haissig*, 2012 IL App (2d) 110726, ¶ 17 (conclusory assertions without supporting legal authority warrants forfeiture of the allegation).

¶ 56    For the fourth factor, both Tate and Stingley never wavered that defendant was the shooter. Although defendant contends that because Stingley asked defendant to step forward in a lineup, this demonstrated uncertainty, Stingley never identified anyone else as being the offender and never stated he was unsure. This factor favors the State when Stingley and Tate positively identified defendant in a photo array, lineup, and at trial. *People v. Piatkowski*, 225 Ill. 2d 551, 569 (2007).

¶ 57    For the fifth factor, the length of time between the crime and the confrontation, favors the State. Tate and Stingley identified defendant in a photo array on April 19, 2015, and on the next day they identified him in a lineup, while the shooting occurred a month earlier on March 19, 2015. The amount of time that elapsed was not considerable. See *People v. Corral*, 2019 IL App (1st) 171501, ¶ 81 (a credible identification made when a witness was presented with a photo array 48 days after the offense and a lineup occurred 14 days after the photo array).

¶ 58    The trial court weighed the evidence and determined that Tate and Stingley were "highly credible and highly reliable." After weighing each *Biggers* factor, we conclude that the trial court's finding that Tate and Stingley viewed the offender under circumstances permitting a positive identification was reasonable. *Id*. ¶ 82. Accordingly, we defer to the trial court's findings as it is the ultimate arbiter of witness credibility. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 17.

¶ 59    Lastly, in regard to defendant's contention that the remaining eyewitnesses contradicted Tate and Stingley, we disagree. We do not find that the testimony of Bonner and Williams made it impossible for the shooter that Stingley saw  to have shot and killed decedent. Both Williams and Bonner testified to hearing gunshots first then seeing someone, who defendant presumes to have been decedent, run into the mouth of the alley. However, Williams testified that he was not paying attention initially and was solely using his peripheral vision when he saw people, who he could not identify, pass his vehicle. When the gunshots rang out, Williams indicated that he ducked out of fear that it was intended for his car. Bonner did not testify to any additional gunshots being fired even though he stated decedent did not run into the alley until after he heard gunshots and therefore presumed that decedent was running away from those gunshots. No witness testified to hearing an additional set of gunshots being fired that day, yet decedent died in the very alley that gunshots were being fired into. Based on these accounts we cannot say that the aforementioned clearly contradicts Tate and Stingley, and thus we find any discrepancy was for the trier of fact to resolve. *Vaughn*, 2011 IL App (1st) 092834, ¶ 24.

¶ 60    The trial court had the opportunity to observe all of the witnesses in this case. We have determined after weighing the *Bigger* factors that both Tate and Stingley viewed the shooter under circumstances that permitted a positive identification. Additionally, we find that William's and Bonner's testimony corroborated the eyewitnesses' accounts of the shooting and did not contradict them. The eyewitness accounts were further corroborated by  a videotape capturing defendant near the scene of the crime on the day of the shooting . Thus, when considering this evidence in the light most favorable to the State, we find that a rational trier of fact would have found defendant guilty beyond a reasonable doubt. *Macklin*, 2019 Il App (1st) 161165, ¶ 17.

¶ 61                              B. Ineffective Assistance

¶ 62    Defendant contends his arrest was unconstitutional because it was done under an investigative alert and counsel's failure to move to suppress it was ineffective assistance of counsel. Defendant asserts that after his unconstitutional arrest he was placed in a lineup and he disclosed to the police, in the videotaped statement, that he was in the area at that time of the shooting. Defendant maintains that counsel could have successfully moved to suppress the arrest  then the subsequent identifications made in the lineup and his videotaped statement would not have been allowed into evidence for the trial court's consideration.

¶ 63    Defendant reminds us that the Illinois constitution requires an affidavit to be signed by a neutral magistrate who makes a probable cause determination pursuant to Ill. Const. 1970, art. I, § 6, in order to support a seizure. Here, no affidavit was signed by a neutral magistrate with facts supporting a probable cause determination. Instead, defendant maintains that the investigative alert was unconstitutional because the Chicago police department made this determination on its own accord citing *People v. Bass*, 2019 IL App (1st) 160640, ¶ 50 as support. Defendant asserts that this court has previously questioned the constitutionality of investigative alerts citing *People v. Hyland,* 2012 IL App (1st) 110966, ¶¶ 19-33 and *People v. Jones*, 2015 IL App (1st) 142997, ¶ 13 as support. Defendant contends that since the arrest was not supported by an affidavit and was not a fast-acting emergency, it violated the Illinois constitution. He alleges that he was prejudiced by counsel's infectiveness when the arrest was not suppressed thereby allowing the trial court to consider the videotaped statement and lineup identification in determining his guilt.

¶ 64    The State contends a motion by trial counsel arguing that the investigative alert was unconstitutional would have been meritless in this case, therefore, counsel could not have been ineffective.  The State asserts that defendant rightly does not contest that there was probable cause. Additionally, the State points out that although this court found investigative alerts to be

unconstitutional in *Bass*, the supreme court has recently vacated it citing *People v. Little*, 2021 IL App (1st) 181984, ¶ 63, as support. The State maintains that the holding of this court is that an arrest based on probable cause and an investigative alert is constitutional. Further, the State contends that even if the motion to suppress got rid of the lineup identification Tate and Stingley both identified defendant the day before, in separate photo arrays. Consequently, the State asserts, their testimony at trial would still be bolstered. Therefore, the State contends, that the decision to not file a motion to suppress cannot be ineffective.

¶ 65    A claim of ineffective assistance of counsel is reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U. S. 668, (1984). *People v. Evans*, 209 Ill. 2d 195, 219 (2004). Under *Strickland,* a defendant must demonstrate that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense because absent counsel's deficient performance there is a reasonable probability that the result of the proceeding would have been different. *Id*. at 219-20. A reasonable probability of a different result is not merely a possibility of a different result but a probability that is sufficient to undermine the confidence in the outcome. *Id*. A defendant must satisfy both the performance and prejudice prongs of *Strickland*, to prevail on this claim. *Id.*

¶ 66    The decision to file a motion to suppress is generally considered a matter of trial strategy which is "entitled to great deference." *People v. Gayden*, 2020 IL 123505, ¶ 28. To establish ineffective assistance based on trial counsel's failure to file a motion to suppress, "the defendant must demonstrate both that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id*.

¶ 67    We find trial counsel was not ineffective for filing a motion to suppress based on the unconstitutionality of investigative alerts. Defendant's trial was commenced in 2017, therefore, trial counsel can only be measured by the legal authority available to him at the time. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 38 (representation pursuant to the prevailing law at the time of trial is adequate, counsel is not tasked with predicting the changes in the law to not be considered incompetent). *Bass* was decided by the appellate court in 2019 and the supreme court in 2021(*People v. Bass*, 2021 IL 125434); years after defendant's trial and pretrial hearings commenced. Trial counsel cannot be penalized for not predicting this law. *Macklin*, 2019 IL App (1st) 161165, ¶ 38. Defendant additionally cites to many cases that were decided in response to the determination in *Bass*[1] which resulted in a split in the first district, however, those cases were also decided after his trial and thus are not relevant to counsel's effectiveness at the time of his trial. *Id*.

¶ 68    We will now address the relevant law at the time of defendant's trial in regard to probable cause for a constitutional arrest. This court in *Hyland*, to which defendant cites to, involved an investigative alert that was issued for the defendant in an unrelated violation of an order of protection. 2012 IL App (1st) 110966, ¶ 31. At trial, there was no evidence presented by the State to demonstrate someone had personal knowledge of why the investigative alert was issued. *Id*. ¶ 25.

¶ 69    Defendant also relies on *People v. Jones*, 2015 IL App (1st) 142997. Similar to *Hyland*, this court also expressed the troubling nature of investigative alerts when it comes to probable cause determinations. *Id*. ¶ 22. The defendant in *Jones* was stopped during a routine traffic stop;

---

[1] *People v. Braswell*, 2019 IL App (1st) 172810; *People v. Thornton*, 2020 IL App (1st) 170753; *People v. Bahena,* 2020 IL App (1st) 180197; *People v. Simmons,* 2020 IL App (1st) 170650.

after doing a name check, the police officer placed him in custody based on an active investigative alert. *Id.* ¶ 19. The police officer then placed the defendant in the officer's car, conducted a search of his vehicle, and found a kilo of cocaine, which was not in plain view. *Id.* The court acknowledged that probable cause exists when the facts at the time of the arrest are sufficient to lead a reasonably cautious person to believe that a crime had been committed. *Id.* ¶17. Accordingly, in *Jones*, the court found that there was no evidence presented to demonstrate that the arresting officers knew of facts that would have supported probable cause. *Id.* ¶ 21.

¶ 70    Both cases are distinguishable to this case. Here, defendant was arrested based on an investigative alert that was issued after he was positively identified by Tate and Stingley as being the shooter through a photo array; therefore, evidence was available to demonstrate probable cause. *Id.* These facts that existed at the time of  arrest would have led a reasonably cautious person to believe that a crime was committed by defendant. *Id.* ¶17. Further, the investigative alert was issued for the same reason that defendant was arrested, and the State presented evidence of the basis for the investigative alert at trial. *Id.* ¶ 22. Based on the case law available at the time of defendant's trial, a motion to suppress would have been meritless because there was sufficient probable cause at the time of arrest that would have led a reasonably cautious person to believe that he had committed a crime. *People v. Love*, 199 Ill. 2d 269, 279 (2002). Thus, we find that failure to bring a meritless motion did not render trial counsel ineffective.

¶ 71                              C.  One-Act, One-Crime Doctrine

¶ 72    Defendant contends that his concurrent sentences of 45 years on two counts of murder is excessive and in violation of the one-act, one-crime doctrine. Defendant asserts that he can only be convicted of and sentenced for one crime. Defendant maintains that since there was only one physical act of first degree murder, he may only receive one conviction and sentence.  Based

thereon he asks this court to amend the mittimus to remove the conviction and sentence on count six, leaving a judgment for only count five. The State agrees with defendant's request that this court vacate his conviction for murder under count six and order that defendant's mittimus reflect a single conviction for first degree murder.

¶ 73 Whether a conviction violates the one-act, one-crime doctrine is a question of law, which we review *de novo*. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). The rule prohibits a defendant from being convicted of multiple offenses that are based on the same single physical act. *Id*. Therefore, if a defendant is convicted of two offenses based upon the same single physical act, the conviction for the less serious offense must be vacated. Here, defendant was charged with six counts of first degree murder. At sentencing, the trial court merged counts one through four into count five, intentional murder, (720 ILCS 5/9-1(a)(1) (West 2014)) and count six, knowing murder (720 ILCS 5/9-1(a)(2) (West 2014)). Those convictions were based on the same single act of murdering decedent. *Johnson*, 237 Ill. 2d 81. Therefore, we agree with both parties that one conviction must be vacated. Since count five requires a more culpable mental state of intentional murder, it should be sustained and count six should be vacated. See *People v. Artis*, 232 Ill. 2d 156, 170 (2009) (a conviction on the most serious offense must be sustained).

¶ 74                                              CONCLUSION

¶ 75 Based on the foregoing, we vacate the first degree murder conviction based on count six of the indictment. We affirm the judgment of the trial court on all other matters. We direct the clerk of the circuit court to correct the mittimus to reflect a single count of first degree murder in count five. See *People v. Johnson*, 385 Ill. App. 3d. 585, 609 (2008) (reviewing court can correct mittimus at any time).

¶ 76 Affirmed in part, vacated in part; mittimus corrected.