2025 IL App (1st) 230473-U

No. 1-23-0473

Order filed February 28, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 2895 |
| | ) | |
| ELBERT DUNCAN, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |
| | ) | |

JUSTICE MITCHELL delivered the judgment of the court.
Presiding Justice Mikva and Justice Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction where the evidence was sufficient to support defendant's guilt of delivery of a controlled substance.

¶ 2    Following a bench trial, defendant Elbert Duncan was found guilty of one count of delivery of a controlled substance and sentenced to six years in prison. On appeal, defendant argues that the evidence was insufficient to prove him guilty because no narcotics were found on his person

after his arrest and body-worn camera footage contradicts witness testimony. For the following reasons, we affirm.

¶ 3     Defendant was indicted and tried on one count of delivery of more than 1 gram but less than 15 grams of a controlled substance, specifically, fentanyl. 720 ILCS 570/401(c)(1.5) (West 2020).

¶ 4     At trial, Chicago police officer Mohammad Baker testified that on June 29, 2021, he was working as an "undercover buy officer" in a narcotics investigation. Baker's job was to purchase narcotics using "1505 funds," which was money with prerecorded serial numbers. At around 10:10 a.m., Baker walked toward the intersection of Gladys Avenue and Pulaski Road in Chicago. He stopped and spoke to a group of two or three people at the intersection of Pulaski and Jackson Boulevard, and he then "ran into" another four or five people as he continued to Pulaski and Gladys. Baker asked an individual standing on Pulaski and Gladys "[i]f anybody was working," which he explained meant if anyone was selling narcotics. The individual looked eastbound towards Pulaski and Gladys, where two or three people stood on the corner.

¶ 5     As Baker walked in the direction where the individual looked, one of the men, whom he identified in court as defendant, began "approaching [him] face-to-face." When he made contact with defendant, Baker asked for "two," which he explained referred to the number of bags of narcotics. Baker exchanged two $10 bills in 1505 funds for two purple-tinted Ziploc bags. As soon as he purchased the narcotics, Baker gave a physical signal to his team that he successfully completed the transaction. Baker then walked to a secure location where he used a radio to inform his team of the transaction and gave them "a full body" description of the "person who sold [him]" the narcotics.

¶ 6 Baker was able to see defendant from his secure location. Enforcement officers detained defendant approximately 20 minutes after the transaction, and Baker positively identified defendant as the person who sold him the narcotics. Defendant was wearing a blue and white paper facemask, black windbreaker coat, pants, and red shoes with "the Nike and Air logo on the side" when he was arrested, the same clothing he wore when he tendered Baker the Ziploc bags. When Baker returned to the police station, the 1505 funds he had tendered to defendant were returned to him.

¶ 7 Baker was equipped with a body camera that recorded video but not audio of the transaction. Portions of the body camera video, People's Exhibit No. 3, were published at trial and entered into evidence.

¶ 8 Baker identified defendant in the body camera video shown in court, and testified that defendant was the man in the black jacket with the face mask seen in the footage. The court overruled the defense's objections to the identification, noting that the video does not show a face and that it would "give the identification the weight that it deserves."

¶ 9 On cross-examination, Baker testified that he took a photograph of his 1505 funds prior to leaving for the undercover purchase. The transaction with defendant was the only transaction he took part in that day. Baker denied that any of the men he spoke with prior to meeting defendant handed him anything. Baker confirmed that he gave the masked individual the 1505 funds. He reached the secure location between three and four minutes after the transaction, which was "between maybe half a block, less than half a block. A block at the most." He confirmed that when he made the radio call, he could see the individual who tendered him the narcotics. Baker testified that the enforcement team was there "almost immediately" after his radio call and detained the

person matching his description. Once detained, Baker positively identified defendant as the person who sold him narcotics.

¶ 10    We have reviewed the body camera footage. In the first part of the video, starting at timestamp 10:00:43 a.m., Baker approaches three men, who are all wearing dark colored jackets. The person to the far left has his dark jacket unzipped over a bright blue shirt and holds an open umbrella, the second man wears a dark baseball cap and black hoodie with white writing on the front, and the third man, on the right, wears a dark zipped up jacket with a tan baseball cap. While Baker speaks with them, the man in the tan cap removes his hands from his jacket pockets and appears to be holding something. At 10:01:28 a.m., the man in the tan cap moves his arm in the direction of the man wearing the dark baseball cap, and in front of Baker, but his hands are not visible on the video. After they finish speaking at around 10:01:30 a.m., the two men in the baseball caps pass in front of Baker and walk in the opposite direction. Baker remains with the man holding the umbrella for another two minutes before continuing down the sidewalk.

¶ 11    In another clip, timestamped 10:10:30 a.m., Baker is approached by a man in a light gray hoodie and tie-dyed shirt with the Nike logo, who is holding an open umbrella and a plastic bottle with a yellow label. They appear to talk for a few seconds before the man walks ahead of Baker to talk to another man further down the sidewalk dressed in a dark jacket. Baker continues in the same direction towards the two men. The second man, wearing a black jacket fully zipped up with the hood drawn, can be seen on the sidewalk ahead of Baker. At 10:11:56 a.m., Baker reaches the second man, and the video shows that he has a blue and white paper facemask obscuring the lower half of his face and the upper half of his face is not visible on the video. Baker speaks with the man for a few seconds and then turns around and heads back in the direction he came from.

¶ 12    Chicago police officer Roberta Chapa testified that she was working as an undercover surveillance officer for the undercover narcotics purchase that day. Her job was to "keep an eye on" Baker. She was in the vicinity of Gladys and Pulaski, where she observed Baker across the street. She kept Baker in her sight except for a few "seconds" when he was walking behind a fence with tall grass that obstructed her view. After she regained sight of Baker "just seconds later," she observed him make a predetermined signal that a positive narcotics transaction had occurred.

¶ 13    Chicago police officer Matthew Sanchez testified that he was working as an enforcement officer on the undercover narcotics purchase, and it was his job to detain individuals involved in narcotics buys conducted with undercover officers. At about 10:12 a.m., he received a radio communication from a team member. He waited 10 to 15 minutes to approach, which is typical to give the "buy officers" a chance to get to a safe location, and then went to the area of the narcotics purchase to search for the individual matching the description he was given.

¶ 14    Sanchez identified defendant in court as the individual who matched the description he was given. On that day, defendant wore a black hooded rain jacket, a white and blue face mask and Nike Air shoes. He placed defendant in custody once the undercover officer positively identified him. Sanchez searched defendant and found two $10 bills of 1505 prerecorded funds on him. He identified a photograph of two $10 bills, People's Exhibit 1, as the bills recovered from defendant on June 29, 2021.

¶ 15    The parties stipulated that, if called to testify, a forensic chemist would testify that the substance inside the Ziploc baggies tested positive for 1.7 grams of fentanyl.

¶ 16    The circuit court found defendant guilty. In announcing its findings, the circuit court noted that Sanchez had stopped defendant because his outfit matched the description given by Baker but

acknowledged that it was "probably a common outfit." The circuit court further noted that between wearing a jacket and shoes that matched Baker's description, having "the 1505 funds on him within 15 minutes of the sale," and Baker's positive identification that defendant sold him the narcotics, the State had met its burden.

¶ 17    The circuit court denied defendant's posttrial motion challenging the sufficiency of the evidence and sentenced defendant to six years in prison.

¶ 18    On appeal, defendant argues that the evidence was insufficient to prove beyond a reasonable doubt that he was the individual who sold narcotics to Officer Baker.

¶ 19    In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact's role is "to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35. It is not our function to retry the defendant. *Id.* We will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses. *Id.* A conviction will not be overturned "unless the evidence is so unreasonable, improbable, or unsatisfactory" that reasonable doubt exists as to the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 20    "The testimony of a single witness is sufficient to convict if the testimony is positive and credible." *Gray*, 2017 IL 120958, ¶ 36. "[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).

A witness's testimony may be found insufficient to convict "only where the evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 72. A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims the witness was not credible. *People v. Bonaparte*, 2014 IL App (1st) 112209, ¶ 41.

¶ 21    To prove delivery of a controlled substance as charged, the State was required to show that defendant unlawfully and knowingly delivered 1 gram or more but less than 15 grams of any substance containing fentanyl. 720 ILCS 570/401(c)(1.5). Defendant challenges his identity as the individual who delivered the narcotics to Baker.

¶ 22    Here, the evidence was more than sufficient to support a finding of guilt. Baker testified that defendant approached him "face-to-face," and Baker gave him two $10 bills in 1505 funds in exchange for two baggies of narcotics. He informed his team of the transaction and gave a description of defendant's clothing, including defendant's red Nike shoes with the word "Air" on them. About 15 minutes after the exchange, defendant was detained and Baker positively identified him as the person who sold him the narcotics. Defendant was arrested and 1505 funds were recovered from his person, which Baker identified as the funds he used to make the purchase with defendant. When reviewing the totality of the evidence, Baker's testimony, coupled with his description of defendant's clothing and recovery of the 1505 funds, were sufficient to for a reasonable trier of fact to infer that defendant was the seller of the narcotics Baker purchased. See *People v. Swenson*, 2020 IL 124688, ¶ 35 (stating that "[a]ll reasonable inferences are drawn in favor of a finding of guilt"). As such, the circuit court's finding of guilt was sufficiently supported by the evidence.

¶ 23   Nevertheless, defendant challenges the sufficiency of the evidence, arguing that his face was never visible on the body camera video and no other indicia that he was selling narcotics was found on his person. He also maintains the 20 minutes that elapsed between the sale and his arrest was plenty of time to allow the 1505 funds to have "changed hands."

¶ 24   Here, Baker's testimony was that defendant wore a zipped up black jacket with the hood up, a blue and white paper facemask, and distinctive red shoes, both when he handed the drugs to Baker and at the time of arrest. The body camera video shows that defendant was the only individual Baker interacted with who wore a zipped up black jacket with the hood up and a blue and white paper facemask. The circuit court noted that, while defendant's clothing "probably is a common outfit," the recovery of the 1505 funds about 15 minutes after the transaction and Baker's positive identification of defendant was "enough."

¶ 25   Although the 1505 funds were the only physical item found on defendant to implicate him in narcotic sales, Baker's description of defendant's clothing was detailed and matched exactly to defendant. The finder of fact "is not required to disregard inferences that flow normally from the evidence before it or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Moreover, none of the other individuals Baker encountered as seen in the body camera video matched the description given of defendant. As such, even where time elapsed between the transaction and his arrest, Baker's description, as supported by the body camera video, is sufficient to draw a reasonable inference that defendant was the seller.

¶ 26   Defendant argues that the body camera "constituted the State's entire case" and was insufficient to prove defendant guilty beyond a reasonable doubt. He contends that the court

convicted him "in large part" because Baker claimed that he continued to keep an eye on defendant from his secure location within a half a block to a block from the location of the transaction, which he contends was not corroborated by the body camera video. However, the circuit court, when making its findings, never referenced the body camera footage. Rather, its discussion of the evidence focused on the recovery of the 1505 funds on defendant following his detention, and Baker's description and positive identification of defendant following his detention.

¶ 27 Defendant maintains that the body camera video suggests that Baker had a prior transaction, that was not visible in the recorded footage, with the three men he spoke with 10 minutes prior to his transaction with defendant. Defendant refers to a portion of footage where the man in the tan baseball cap removes his hands from his pockets and his arm is outstretched in front of Baker. The footage in question does not show any transaction between Baker and the man in the tan baseball cap. When viewing this footage in a light favorable to the State, as we must, we cannot reasonably infer that a transaction occurred. Furthermore, Baker explicitly testified that the only transaction he participated in that day was with defendant.

¶ 28 Finally, defendant contends that Officer Sanchez's testimony contradicts Baker's testimony regarding the timing of defendant's arrest. He maintains Baker testified that defendant was arrested "almost immediately" whereas Sanchez testified that the arresting officers waited 15 minutes as was typical in undercover transactions. The circuit court could reasonably find the discrepancy in testimony regarding the timing of the arrest did not render the entirety of Baker's unreliable. "Contradictory evidence or minor or collateral discrepancies in testimony do not automatically render a witness's testimony uncredible, and it is the task of the trier of fact to determine if and when a witness testified truthfully." *People v. Macklin*, 2019 IL App (1st) 161165,

¶ 17. The circuit court was "in the superior position to assess the credibility of witnesses, resolve inconsistencies, determine the weight to assign the testimony, and draw reasonable inferences therefrom." *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 24. We do not retry a defendant or substitute our judgment for that of the trier of fact on witness credibility or the weight of evidence. 2019 IL App (1st) 161165, ¶ 17.

¶ 29    In conclusion, when viewing all the evidence in a light most favorable to the State, a rational trier of fact could have reasonably found that defendant was the individual from whom Baker purchased the narcotics.

¶ 30    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 31    Affirmed.